■ AMY B. LABANOWSKI, Appellant-Respondent, v JEFFRY E. LABANOWSKI, Respondent-Appellant. ROBERT M. KELLY, as Law Guardian, Appellant-Respondent. [772 NYS2d 734]—

Spain, J.P. Cross appeals from an order of the Supreme Court (Aulisi, J.), entered April 22, 2003 in Warren County, which, inter alia, granted defendant's motions to hold plaintiff in contempt.

Plaintiff (hereinafter the mother) and defendant (hereinafter the father) are the parents of three children, Cassandra (born in 1983), Vatoria (born in 1988) and Joshua (born in 1990). The parties separated in March 2000 and thereafter Family Court, Warren County, ordered joint custody of the children with primary physical custody and residence with the mother and specified overnight visitation with the father, all apparently on consent. In May 2000, the mother commenced a divorce action in Supreme Court.[1] Because the children were resistant to visitation from the outset, Family Court ordered the family to participate in therapeutic counseling with two specified therapists to

---

1. The proceedings in Family Court were eventually transferred to Supreme Court.

"facilitate the father's visitation." In November 2001, due to the children's continuing and adamant refusal to visit with their father over an 18-month period, the court issued a supplemental order directing, among other things, that the two younger children (then ages 12 and 11) and both parents participate in "therapeutic visitation" counseling with a new therapist for at least one-half hour each week.[2] That order further directed that, after one month of therapeutic visits, the father would have unsupervised visits two hours per week at a neutral site, and it required the parents to engage in individual counseling, and reflected that "[t]he parties agree that each shall strive to facilitate such visitation, and that the children should not refuse to take part in the visitation, nor should there be interference in any way with such visitation." Within a month, Thomas Osika, a clinical psychologist, began the therapeutic visits at his office between the children and the father, but they were unsuccessful as the children refused to cooperate and their mother remained unwilling to facilitate and lend supportive approval to the court's directive. The unsupervised visitation was likewise not accomplished.

As a result of the repeated breakdown in visitation, the father filed three motions in Supreme Court primarily seeking a change in custody and that the mother be held in contempt. The contempt charges stemmed from the mother's violation of the court's visitation orders by, among other things, failing to cooperate in the therapeutic visitation counseling between the children and the father and failing to bring the children to the home of the father's parents in August 2002 for a family reunion visit. Following a three-day hearing in September and October 2002 focused on facts surrounding the alleged contempt, Supreme Court issued a decision and order finding no legitimate reason for the children's refusal to visit with their father and concluding that the mother had knowledge of the court's directives and willfully violated its orders, "either by omission or commission." As a sanction for the mother's contempt, Supreme Court "pendente lite" transferred custody of the children to the father with physical custody in the Warren County Department of Social Services for placement in foster care. The court further directed that the mother have visitation with the children only in the presence of the children's counselor, initially for no more than one hour per week, and that the mother's parents not have any visitation with the children pending fur-

---

2. At the time of the orders which formed the basis for the decision and order appealed from, Cassandra was over the age of 18. Accordingly, Supreme Court's decision with respect to custody and visitation does not apply to her.

ther instructions from the court. The court also ordered that the father's initial visits with the children be in the presence of their counselor for two hours per week, terminated the father's child support obligation with respect to Cassandra, the oldest child, and awarded him counsel fees. The mother, father and the children—through their Law Guardian[3] —have all appealed.[4]

To summarize, despite the initial Family Court joint custody order and supplemental orders of visitation, the children have refused to visit with their father since shortly after the parties' separation. Repeated and persistent attempts by the father, the court and several professionals have been unsuccessful. As a result, in the last four years there has been little, if any, genuine visitation and virtually no relationship between the father and his children. The father insists on being given the opportunity to have a meaningful relationship with his children and nothing contained in the record supports the ongoing denial of that right. The children, now 15 and 13, have expressed that they do not love their father and do not want to visit with him and, even when they have physically appeared in a therapeutic setting, they have nearly always refused to talk to him. When on a number of occasions during the summer of 2002, under court order and threat of contempt, the mother delivered them to a neutral visitation site, they either refused to get out of her car or, if they did get out of the car and remained in his presence during the visitation period, they openly expressed hostility or did not speak at all.[5]

According to the therapists, there is no justifiable reason for the children to be so resistant to visiting with their father and he represents absolutely no danger to them. Moreover, despite a full opportunity during the course of the hearing, neither the children nor the mother have articulated any justifiable reasons for the children's refusal to see their father. In our view, there is ample evidence in the record to support the conclusion that, throughout the more than three years leading up to the contempt hearing, the mother did very little, if anything, to

**3.** It is unfortunate that the Law Guardian failed to file a brief in this extremely troubling case and, instead, informed this Court that he joined in the mother's appellate brief.

**4.** This Court granted a stay of so much of the order as awarded custody to the father and granted physical custody to DSS pending the determination of this appeal.

**5.** When the selected site was a municipal swimming pool, the children went off by themselves to swim during the visitation period. When the site was a mall, they would get out of the car and meet with him, each stating that they did not want to visit with him, and immediately return to the awaiting car to be driven away by their mother or her sister.

genuinely or affirmatively encourage the children to comply with the court orders and visit with their father; rather, she communicated to them, verbally and otherwise, that she was not happy with visitation being imposed upon them and allowed the children to decide themselves whether to comply with the court orders.[6]

The father's initial allegation in his contempt request was that the mother violated the clear mandate of the November 2001 order when she failed to encourage the children to keep their appointments with Osika, and refused to schedule or consent to appointment dates for the children for continuing therapeutic visitation. Osika's testimony and report demonstrated that in mid-December 2001, when he attempted to schedule two consecutive weekly appointments for the children, the mother "became very difficult" and refused to disrupt their schedules, which resulted in no further appointments that year. At a scheduled appointment on January 2, 2002, the father appeared with Christmas presents for the children—not having seen them during the holidays—and the mother showed up alone reporting that the children had refused to come, that she would have had to physically put them in her vehicle. Consequently, Osika stopped scheduling visits and sent his report to the court. The evidence, including the mother's testimony, supports a finding that she was not willing to alter their schedules, made no attempt to reschedule these dates, and allowed them to decide whether to comply with the court order.

In the other alleged violation, an ex parte order of Supreme Court dated August 29, 2002 directed the mother to drive the children to the father's parents' home in Orange County for a family reunion visit by noon on August 31, 2002 and the father was to return them that night. The mother had notice of the court's decision several days in advance. However, on the morning of the reunion visit, the mother's father called his treating physician and longtime friend, a medical doctor, and arranged for the mother to bring the children to the doctor's office. After listening to their complaints and examining them, the doctor concluded that they were "emotionally upset," recommending against the trip. The mother thereafter informed the father by

---

6. In early 2002, when the father left several messages on the mother's voice mail seeking to schedule unsupervised visitation, she had him arrested on a harassment charge, which was later dismissed. The mother's refusal to facilitate the children's cooperation is reflected in a statement by one of the children to a therapist, "My mother supports us no matter what we want to do, if we want to go on visits that's fine and if we don't that's fine too." The children of the mother's sister have similarly been estranged from their father since their parents' separation.

phone that the children would not be making the trip. Notably, the doctor had been aware of the difficulties between the mother and father through conversations socially and professionally with the maternal grandparents and with the mother who had recently become his patient. Supreme Court, justifiably, gave little weight to the doctor's diagnoses.

"To sustain a finding of civil contempt based upon a violation of a court order, it is necessary to establish that a lawful court order clearly expressing an unequivocal mandate was in effect and that the person alleged to have violated that order had actual knowledge of its terms" (*Graham v Graham*, 152 AD2d 653, 654 [1989] [citations omitted]). It must also be demonstrated that the offending conduct or failure to act "defeated, impaired, impeded or prejudiced" a right or remedy of the moving party (Judiciary Law § 753 [A]; *see Paulmann v Paulmann*, 224 AD2d 891, 893 [1996]; *Matter of Frandsen v Frandsen*, 190 AD2d 975, 976 [1993]). "Although it is not necessary that the order actually have been served upon that party, actual notice is an essential predicate to a contempt order" (*Graham v Graham, supra* at 654 [citation omitted]).

A careful review of the record evidence, both direct and circumstantial, fully supports Supreme Court's findings that, in the two cited instances, the mother violated a clear and unequivocal mandate of the court.[7] There was compelling support for the conclusion that the mother has been unwilling to rise above her dislike for the father in order to genuinely and affirmatively encourage the children to have contact and a positive relationship with their father notwithstanding any minor human failings he has, not unlike many sound and loving parents. Rather, she has both actively and passively fostered their aversion to him—and permitted others to do so—thereby depriving them of the benefits of having two supportive parents while denying the father a meaningful relationship with his children, all amply supporting the contempt finding. Notably, there is also more than adequate record support for the court's finding that the father faithfully met his obligations as set forth in the court's orders.

Despite our determination to uphold Supreme Court's finding of contempt, we find that it was error for the court to impose a change in custody as a sanction. The penalty for civil contempt is limited to a "fine and imprisonment, or either" (Judiciary Law § 753 [A]; *see* Family Ct Act § 156). To be sure, a custodial

7. A third violation finding regarding a scheduled visit subsequent to a Father's Day 2002 visit is not supported in the record, due to the equivocal nature of the court's remarks regarding that visit.

parent's willful interference with a noncustodial parent's right to visitation has been deemed, in some cases, to be an act " 'so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as a custodial parent' " (*Matter of Glenn v Glenn*, 262 AD2d 885, 887 [1999], *lv dismissed, lv denied* 94 NY2d 782 [1999], quoting *Entwistle v Entwistle*, 61 AD2d 380, 384-385 [1978], *appeal dismissed* 44 NY2d 851 [1978]; *accord Matter of Ahmad v Naviwala*, 306 AD2d 588, 591 [2003], *lv dismissed* 100 NY2d 615 [2003]). However, "[w]hile 'a party's prior misconduct or "bad act" may be considered if that conduct impacts upon the best interests of the children,' the issuance of a final order [changing] custody as a punishment to the ' "recalcitrant parent" ' without a full and plenary hearing on this issue, was error" (*Matter of Hess v Hess*, 243 AD2d 763, 764-765 [1997] [citations omitted]; *cf. Matter of Glenn v Glenn, supra* at 887).

While Supreme Court acknowledged that a change in custody was an issue, albeit at a late stage in the contempt hearing, the court throughout the hearing regularly reiterated that it was a contempt hearing and precluded most of the witnesses from directly testifying to best interests evidence. A full review of the record makes clear that it was a contempt hearing which resulted in a transfer of custody as punishment for the mother's repeated violation of court orders and did not address or resolve the best interests of the children with regard to a change in custody. Accordingly, the court impermissibly changed custody without the benefit of a full plenary hearing addressing change in circumstances/best interests (*see* Family Ct Act § 467 [b] [ii]; *Matter of Robert GG. v Kathleen HH.*, 273 AD2d 713, 714 [2000]; *Matter of Lukaszewicz v Lukaszewicz*, 256 AD2d 1031, 1032-1033 [1998]).

We reject the mother's contention that Supreme Court erred in terminating Cassandra's child support. While "a parent has a statutory obligation to support his or her child until such time as the child reaches 21 years of age, . . . 'the child's right to support and the parent's right to custody and services are reciprocal' . . . [and thus] a child of employable age, who actively abandons the noncustodial parent by refusing all contact and visitation, without cause, may be deemed to have forfeited his or her right to support" (*Matter of Chamberlin v Chamberlin*, 240 AD2d 908, 909 [1997] [citations omitted]). Here, the record fully supports the termination of the father's obligation to support Cassandra who, without justifiable reason, has made it clear to the court that she does not want him in her life, even having him arrested for harassment in 2002 after he left a

valentine on the windshield of her car, a charge which was later dismissed.

The mother did not appeal from Supreme Court's September 25, 2002 temporary order directing that the father's support payments be paid into escrow rather than to her and, thus, her claims of error cannot be addressed. Further, although the record supports the conclusion that the mother's lack of cooperation with the court-ordered visitation was willful and harmful, we cannot agree with the father's assertion that Supreme Court erred in not incarcerating her. Incarceration was, and remains, but one of the discretionary options available to the court in this initial civil contempt proceeding (see Judiciary Law § 753 [A]). Because this Court has determined that the change in custody sanction was not an option on this record, we will remit for the court to now de novo reconsider, at its discretion and upon additional or updated proof as the court deems necessary, whether incarceration and/or a fine are appropriate, noting that the trial court continues to be "in a superior position to decide the extent of the punishment required to enforce its orders" (Matter of Wright v Wright, 205 AD2d 889, 892 [1994]; Paulmann v Paulmann, 224 AD2d 891, 894 [1996], supra).

Finally, the mother's assertion that Supreme Court was biased is simply not supported by the record. While the court readily grasped the mother's steadfast unwillingness to encourage the children to see their father, its understandable frustration with the troubling and protracted circumstances of this case did not reflect bias. Accordingly, this entire matter should be remitted to Supreme Court for further proceedings on the pending petitions including, but not limited to, the determination of a new penalty, if any, for the mother's contempt and a best interests hearing, if necessary. The court is also directed to consider, in its wisdom and discretion, all available avenues to correct the damage already done and to get the parties to overcome their differences so that the children and the father will have at least a true and fair opportunity to reestablish a meaningful relationship and, if appropriate, to give the mother an opportunity to purge herself of her contempt (see Paulmann v Paulmann, supra at 894).

We have considered the parties' remaining contentions and find they are without merit.

Mugglin, Rose, Lahtinen and Kane, JJ., concur. Ordered that the order is modified, on the law and the facts, without costs, by reversing so much thereof as granted custody of the children to defendant and placed the children in the physical custody of the Warren County Department of Social Services for placement in

foster care; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.